IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TGI FRIDAY'S INC., | § | |
| | § | |
| Plaintiff- | § | |
| counterdefendant, | § | |
| | § | Civil Action No. 3:09-CV-0083-D |
| VS. | § | |
| | § | |
| GREAT NORTHWEST RESTAURANTS, | § | |
| INC., et al., | § | |
| | § | |
| Defendants- | § | |
| counterplaintiffs. | § | |

MEMORANDUM OPINION
AND ORDER

In this trademark infringement action, plaintiff-counterdefendant TGI Friday's Inc. ("TGIF") seeks a preliminary injunction to prevent defendants-counterplaintiffs, its former franchisees, from continuing to use its trademarks and service marks in connection with restaurants they own and operate in California, Oregon, and Washington. For the reasons that follow, the court grants TGIF's application and enters a preliminary injunction by separate order filed today.[1]

---

[1]The court is deciding TGIF's preliminary injunction application on the papers, without conducting an evidentiary hearing, as permitted by Fed. R. Civ. P. 43(c) (formerly Rule 43(e) before it was renumbered effective December 1, 2007 under the restyled civil rules). *See, e.g.*, *Wireless Agents, L.L.C. v. Sony Ericsson Mobile Commc'ns AB*, 390 F.Supp.2d 532, 533 n.1 (N.D. Tex. 2005) (Fitzwater, J.) (addressing former Rule 43(e)), *aff'd*, 189 Fed. Appx. 965 (Fed. Cir. 2006). Pursuant to Rule 52(a), the court sets out its findings of fact and conclusions of law in this memorandum opinion and order.

I

This action arises from a failed franchise relationship between TGIF and defendants-counterplaintiffs Great Northwest Restaurants, Inc. ("Great Northwest"), Ten Forward Dining, Inc. ("Ten Forward"), TGIA Restaurants, Inc. ("TGIA"), PRC Restaurants, Inc. ("PRC"), Mike Alizadeh ("Mike"), and Abe Alizadeh ("Abe") (collectively, "defendants").

TGIF operates and franchises TGI Friday's-brand casual dining restaurants throughout the United States. Between 1997 and 2006, TGIF entered into 11 separate franchise agreements with defendants. It entered into agreements with Great Northwest to operate four franchise locations in Washington and one in Oregon, and with PRC to operate a franchise location in Washington. TGIF also entered into franchise agreements with Capital City Restaurants, Inc. ("CCR") to operate five franchise locations in California. Mike was the President and principal of Great Northwest, PRC, and CCR, and he guarantied the performance of all three corporations under the franchise agreements. In 2007 the five CCR franchise agreements were assumed by TGIA and Ten Forward, for which Abe serves as President and principal. TGIA assumed three of CCR's franchise agreements, and Ten Forward assumed the other two.[2]

The franchise agreements between TGIF and defendants are all

_____

[2]TGIA closed one of its California franchise locations in April 2008, apparently without TGIF's consent. Therefore, only ten of defendants' restaurants are in active operation.

- 2 -

substantially similar, and the court accordingly considers them together.  Pursuant to the franchise agreements, TGIF authorizes defendants to use its trademarks and service marks in connection with the operation of their restaurants as TGI Friday's locations. The agreements expressly provide, however, that defendants must immediately cease use of TGIF's marks upon termination of the agreements.  *See, e.g.*, P. App. 45-46 ("Upon any termination . . . Franchisee shall . . . immediately cease to use . . . the Proprietary Marks and other distinctive signs, symbols and devices associated with the System.").[3]  Defendants are also obligated to make monthly payments to TGIF for royalties, advertising, and other related fees (the "franchise fees").  Failure to make a payment on the date payable constitutes a default event, after the occurrence of which TGIF may, after giving the franchisee notice and an opportunity to cure, terminate the franchise agreement.

Defendants admit that they ceased paying the requisite franchise fees in 2007.  TGIF notified defendants by letter of the defaults, and it gave them a deadline to cure the defaults.  No fewer than seven times, TGIF extended the deadline.  After defendants failed to cure their defaults by the final deadline, TGIF terminated the franchise agreements by separate letters dated

---

[3]Unless otherwise noted, when the court cites TGIF's appendix, it refers to its January 14, 2009 appendix in support of TGIF's complaint and application for temporary restraining order and preliminary injunction.

December 18, 2008.   The termination letters demanded compliance with the terms of the franchise agreements, including the immediate cessation of use of TGIF's marks.   Defendants concede that they did not cease using TGIF's marks on receipt of the termination letters, and that they continue to use the marks and hold their restaurants out as TGI Friday's locations.

Because of defendants' continued use of TGIF's trademarks and service marks, TGIF brought this action against them, asserting claims for Lanham Act infringement, 15 U.S.C. § 1114, Lanham Act false designations, 15 U.S.C. § 1125(a), common law trademark infringement, and common law unfair competition.   Defendants assert a number of counterclaims that are largely irrelevant to this decision.   *See infra* note 7 (discussing irrelevance of defendants' counterclaims).   TGIF applies for a preliminary injunction to prevent defendants' further use of its marks in connection with the operation of their restaurants.[4]

                                    II

The decision whether to grant a preliminary injunction is within the discretion of the court, but it is an extraordinary remedy that should only be granted if the movant has clearly carried its burden.   *See Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985).   To obtain a preliminary

_____

[4]Adjudication of the preliminary injunction application was deferred while the parties pursued settlement.   It is now ripe for determination.

injunction, TGIF must establish (1) a substantial likelihood that
it will prevail on the merits, (2) a substantial threat that it
will suffer irreparable injury if the injunction is not granted,
(3) that the threatened injury to it outweighs the threatened harm
the injunction may do to defendants, and (4) that granting the
preliminary injunction will not disserve the public interest. *See,
e.g., Jones v. Bush*, 122 F.Supp.2d 713, 718 (N.D. Tex.) (Fitzwater,
J.), *aff'd*, 244 F.3d 134 (5th Cir. 2000) (per curiam) (unpublished
table decision).  TGIF must satisfy all four requirements. *See id.*

III

The court need only consider whether one of TGIF's claims——its
action for trademark infringement brought under the Lanham Act, 15
U.S.C. § 1114——has a substantial likelihood of success.  To succeed
on a trademark infringement claim, a plaintiff first must show
ownership of a legally protectable mark, and then it must establish
infringement of the mark. *See Am. Rice, Inc. v. Producers Rice
Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).  Under the Lanham
Act, infringement exists if a person "uses (1) any reproduction,
counterfeit, copy, or colorable imitation of a mark; (2) without
the registrant's consent; (3) in commerce; (4) in connection with
the sale, offering for sale, distribution, or advertising of any
goods; (5) where such use is likely to cause confusion, or to cause
mistake or to deceive." *Id.* (brackets omitted) (quoting *Boston
Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg.*, 510 F.2d

- 5 -

1004, 1009-10 (5th Cir. 1975); citing 15 U.S.C. § 1114).

Defendants do not dispute that the proprietary marks referred to in the franchise agreements and registered by TGIF are owned by TGIF and are legally protected.  Defendants also admit that they are using TGIF's marks in commerce in connection with the sale of goods.  Defendants are using TGIF's exact marks, not merely similar marks, and are holding their restaurants out as TGI Friday's locations.  Therefore, if they are using the marks without TGIF's consent, it is evident that there is a likelihood of consumer confusion between licensed TGI Friday's restaurants and defendants' restaurants.  *See Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 311 (5th Cir. 2008) (holding that district court need not analyze all "digits of confusion" when alleged infringer is using exact marks of plaintiff); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983) ("Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks."); *Petro Franchise Sys., LLC v. All Am. Props., Inc.*, 607 F.Supp.2d 781, 788 (W.D. Tex. 2009) (holding that franchisees' unauthorized use of franchisor's marks establishes likelihood of confusion).

Accordingly, the only element of infringement in dispute is whether defendants are using TGIF's marks with its consent, or whether their use is unauthorized.  The court finds and concludes that TGIF has established a substantial likelihood that defendants'

use is unauthorized.  The franchise agreements give defendants the right to use TGIF's marks while they are in effect; however, they expressly provide that defendants must immediately cease use of TGIF's marks upon termination of the agreements.  *See, e.g.*, P. App. 45-46 ("Upon any termination . . . Franchisee shall . . . immediately cease to use . . . the Proprietary Marks and other distinctive signs, symbols and devices associated with the System.").  It is clear that if TGIF terminated the franchise agreements, defendants' continued use of its marks is unauthorized.

As discussed above, the events leading to and consummating the termination of the franchise agreements are largely undisputed. Defendants failed to pay their franchise fees, which constitutes a default under the agreements.  Pursuant to the agreements' terms, TGIF notified defendants of each default in writing and gave them sufficient opportunity to cure the defaults.  Defendants failed to cure the defaults, and TGIF subsequently terminated each franchise agreement by separate letters dated December 18, 2008.  The termination letters demand compliance with the terms of the franchise agreements, including the immediate cessation of use of TGIF's marks.

Although defendants concede that they failed to make the requisite royalty payments and do not dispute that TGIF followed the termination procedure set forth in the franchise agreements, they contend that TGIF's termination of the agreements is "wrongful

and improper."[5]   Ds. Br. 18.   Defendants argue that TGIF is responsible for their inability to pay the franchise fees because the food distribution system implemented by TGIF is discriminatory and cost-prohibitive to them.   According to defendants, prior to 2000 TGIF had in place a nationwide food distribution system that allowed for uniform food pricing across the country, including uniform freight charges.   When the distributor who provided this distribution service went bankrupt in 2000, TGIF had to negotiate and enter into a contract for a new distribution system.   The distribution agreement that TGIF entered into and implemented no longer included uniform freight charges among participating franchises.   Franchises, including defendants, located a great distance from the new distributor had to pay greater freight charges if they chose to participate.   Defendants contend that participation in the distribution system was cost-prohibitive.   And they apparently decided not to participate in TGIF's food distribution system and, instead, to negotiate their own agreements with regional distributors.   They now assert that their increased

_____

[5]As the court in *Petro Franchise Systems* noted, the Fifth Circuit has not addressed whether a franchisor seeking injunctive relief is required to establish proper termination of the franchise agreements in order to show lack of consent.   *See Petro Franchise Sys.*, 607 F.Supp.2d at 789-90.   Several other circuits, however, have indicated that such a showing is necessary.   *See, e.g., S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992). The court need not decide this issue here, however, because it concludes that TGIF has adduced substantial evidence showing that it is likely to succeed in establishing proper termination.

distribution costs render them unable to pay the requisite franchise fees to TGIF. Essentially, defendants argue that TGIF did not have good cause to terminate the franchise agreements because TGIF's choice of distribution system led to defendants' default, and that TGIF breached its duty of good faith and fair dealing when it entered into an agreement for a national food distribution system that increased defendants' costs.

Defendants' vague allegations do not diminish TGIF's likelihood of success on its trademark infringement claim. First, it is highly unlikely that defendants can prevail on these claims. Defendants' allegations stem from a business decision made by TGIF in 2000, and defendants offer no evidence that they raised any of the alleged distribution-related issues until after they defaulted on the franchise agreements in 2007. For approximately seven years they negotiated their own food distribution contracts without pursuing any claims or issues. Also, to prevail on these claims, it is necessary for defendants to prove that they are not barred by the "Second Forbearance Agreement" that the parties executed on April 27, 2007 and that waives any distribution-related claims defendants may have had.[6]

---

[6]The "Second Forbearance Agreement" provides:

> Franchisee and Principal hereby confirm and agree that there are no defenses, offsets, claims or counterclaims of any kind or nature to the payment to Friday's of the Friday's Receivable or the balance due under the

- 9 -

Moreover, even accepting all of defendants' assertions as true and assuming that defendants could prove these claims, neither the propriety of TGIF's termination of the franchise agreements nor its likelihood of success on its infringement claim is affected. First, defendants cite no case law or precedent for the proposition that a franchisee who is negatively affected by a business decision of a franchisor (where that decision is not a breach of contract) is excused from performing its contractual obligations.  Even if defendants can show that TGIF's decision "led" to their inability to pay the franchise fees, they do not explain how this excuses them from performing under the contract or cite any provisions of the franchise agreements that would excuse them.  The terms of the franchise agreements clearly provide that failure to pay the franchise fees constitutes a default, and defendants point to no contractual terms that would excuse their nonpayment.  Second, even if defendants have a claim for breach of a duty of good faith and fair dealing (and it is not clear that they do), this does not excuse their nonperformance under the franchise agreements or render TGIF's termination of the agreements improper.  Under Texas

---

Amended Note.  Franchisee and Principal hereby waive and relinquish all such defenses, offsets, claims or counterclaims regardless of whether such defenses, offsets, claims or counterclaims are now known to the Franchisee or Principal.

*E.g.*, P. May 5, 2009 App. 869.

- 10 -

law, which applies to the franchise agreements, if a defendant believed that TGIF breached the contract, it had two options: continue to perform the contract and sue for partial breach, or cease performance and treat the contract as terminated. *See Petro Franchise Sys.*, 607 F.Supp.2d at 791 (citing *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 887 (Tex. App. 1996)); *Gupta v. E. Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 756-57 (Tex. App. 2004, pet. denied). A defendant could not cease performing its obligations under the franchise agreement——e.g., paying the franchise fees——while continuing to treat the agreement as valid and enjoying the benefits granted under the agreement——e.g., using TGIF's marks. Also, any claims defendants may have against TGIF, including breach of contract or breach of a duty of good faith and fair dealing, have no apparent effect on TGIF's right to terminate the agreements pursuant to their terms.[7] When defendants failed to pay their franchise fees and failed to cure their defaults, TGIF had the right to terminate the agreements. Defendants cite no cases that support their apparent theory that a breach of a duty of good faith and fair dealing that allegedly began almost one decade ago now excuses their obligation to pay franchise fees or otherwise

---

[7]In addition to the claims defendants discuss in their brief opposing TGIF's preliminary injunction application, they assert a number of related counterclaims in their February 19, 2009 answer. For the reasons discussed above, these counterclaims have no impact on TGIF's right to terminate the franchise agreements and do not preclude TGIF from obtaining a preliminary injunction.

waives TGIF's right to terminate the franchise agreements.  Indeed, as the court stated in *Petro Franchise Systems*, "[t]his Court is not aware of a single case where, as here, a franchisee was terminated for non-payment of fees as plainly set forth in a franchise agreement, did not contest its non-payment, and nevertheless established improper termination."  *Petro Franchise Sys*., 607 F.Supp.2d at 790.  In sum, none of defendants' arguments calls into question the propriety of TGIF's termination of the franchise agreements, which was undertaken pursuant to the express terms of the agreements.

Defendants also briefly argue that their use of TGIF's marks is not unauthorized because TGIF is assisting in the operation of their restaurants.  They assert that TGIF has continued to inspect their restaurants, to send them menus and other promotional materials, and to list the restaurant locations on its website.  These actions do not indicate, however, that TGIF has waived its termination of the franchise agreements or consented to defendants' continued use of its marks.  Defendants' argument has been rejected by several courts.  *See id.* at 790 n.8 (holding that continued listing of terminated franchises on franchisor's website was irrelevant to consent); *Burger King Corp. v. Lee*, 766 F. Supp. 1149, 1156 (S.D. Fla. 1991) ("*Burger King*") (holding that franchisor's providing of food products to terminated franchises did not demonstrate waiver of termination or consent).  As the

*Burger King* court recognized, when a terminated franchisee persists in passing itself off as a licensed franchise, it is natural for the franchisor to attempt to monitor the franchisee, and this decision "should not intrude upon [its] right or entitlement to a preliminary injunction." *Burger King*, 766 F. Supp. at 1156 (quoting *Burger King Corp. v. Moore & Zindel*, No. 89-1023, slip op. at 13 (S.D. Fla. Aug. 14, 1989)). In the present case, TGIF has continuously mandated that defendants cease using its marks, as is defendants' post-termination obligation, and defendants cannot reasonably believe that TGIF authorizes or consents to such use.

TGIF has shown through strong and largely undisputed evidence that it has a high likelihood of proving that it properly terminated the franchise agreements and that defendants' continued use of its marks is unauthorized. Accordingly, it has clearly established that there is a substantial likelihood that it will prevail on the merits of its trademark infringement claims.

IV

The court finds and concludes that TGIF has established that there is a substantial threat that it will suffer irreparable injury if the injunction is not granted. Because defendants continue to use TGIF's marks and hold their restaurants out as licensed TGI Friday's locations, it is inevitable that customers will be confused into believing that they are dining at TGI Friday's restaurants. In fact, defendants are promoting consumer

- 13 -

confusion by holding out their restaurants as TGI Friday's locations even though TGIF does not sponsor or control defendants' restaurants. This consumer confusion means that TGIF no longer possesses control over its valuable trademarks or its reputation. This loss of control constitutes a substantial threat of irreparable injury.

Defendants' primary argument is that the court cannot presume that a substantial threat of irreparable injury exists simply because there is a likelihood of confusion. The majority of the circuits "have addressed this issue and held that a court may presume irreparable injury upon finding a likelihood of confusion in a trademark case." *Paulsson*, 529 F.3d at 312 (citing cases from the First, Second, Third, Sixth, Seventh, Eighth, Ninth, Eleventh Circuits). District courts in the Fifth Circuit, including this one, have applied this presumption. *See, e.g.*, *Equibrand Corp. v. Reinsman Equestrian Prods., Inc.*, 2007 WL 1461393, at *15 (N.D. Tex. May 17, 2007) (Solis, J.) ("In a trademark case, a plaintiff may show irreparable injury by establishing a substantial likelihood of confusion."); *Ramada Franchise Sys., Inc. v. Jacobcart, Inc.*, 2001 WL 540213, at *3 (N.D. Tex. May 17, 2001) (Fitzwater, J.) ("In a trademark infringement case, a substantial likelihood of confusion constitutes irreparable injury." (internal quotation marks omitted)). The Fifth Circuit, however, has explicitly avoided deciding this issue. *See Paulsson*, 529 F.3d at

313.  In *Paulsson* the Fifth Circuit held that it need not decide whether such a presumption was proper because the facts of the case supported a finding of a substantial threat of irreparable injury. *Id.*   *Paulsson* held that, where a contractor was using the trademarks of a seismic imaging service provider, there was a substantial threat of irreparable injury to the service provider because it had lost control of the quality of the product associated with its marks, which posed a substantial threat to the service provider's goodwill and the value of its marks.   *Id.*

Here, as in *Paulsson*, the court need not presume irreparable injury because it finds and concludes that TGIF has established a substantial threat of irreparable injury without such a presumption.   TGIF has shown that, through defendants' continued passing off of their restaurants as TGIF franchises after the termination of the franchise agreements, TGIF has lost control over its valuable trademarks and the quality of the restaurants operating under its name.   This lost control poses a substantial threat of injury to TGIF's reputation and the goodwill it has built in its brand.   Such injury is irreparable, as it cannot be remedied through monetary damages.   As this court recognized in *Ramada Franchise Systems*, "[a] bad experience at one location of what is supposed to be a relatively uniform chain may influence the customer to view the entire franchise poorly."   *Ramada Franchise Sys.*, 2001 WL 540213, at *3.   And the *Petro Franchise Systems* court

reasoned that "if Franchisees fail to provide the quality of service customers expect, customers will almost certainly attribute the poor service to Plaintiffs and could be discouraged from returning to other [of Plaintiffs'] franchises in the future." *Petro Franchise Sys.*, 607 F.Supp.2d at 795. The magnitude of the threat is exacerbated in this case, where defendants continue to operate ten restaurants on the West Coast under TGIF's brand and marks. Defendants' restaurants were the only TGI Friday's locations in Washington, Oregon, and the Sacramento area of California. TGIF has therefore lost control of its trademarks, reputation, and customer goodwill in all of the Pacific Northwest and part of Northern California.

Defendants argue that TGIF's reputation is not threatened because they are meeting the standards that TGIF requires of its franchises. Even assuming this is true, it does not negate the substantial threat to TGIF. Courts have held that a franchisor suffers a risk of injury to its reputation and the value of its marks even if the alleged infringer offers superior services. *See id.* The court in *Petro Franchise Systems* held that, "if the Franchisees' services are different in any way, the common denominator is a Plaintiffs' loss of control over their goodwill," and "[h]owever that loss may manifest itself, it constitutes a substantial threat of irreparable harm." *Id.; Quantum Fitness Corp. v. Quantum LifeStyle Ctrs., L.L.C.*, 83 F.Supp.2d 810, 831

- 16 -

(S.D. Tex. 1999) ("When a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods or services constitutes an immediate and irreparable injury, regardless of the actual quality of those goods or services.") Defendants also briefly contend that TGIF still has control over the quality of the restaurants because TGIF representatives were permitted to inspect some of the restaurants during the spring of 2009. Just as this fact does not indicate consent, it does not demonstrate control over defendants' restaurants or their quality, and it certainly does not demonstrate control over TGIF's trademarks. Defendants are operating ten restaurants in the Pacific Northwest and Northern California as TGI Friday's locations without the consent or sponsorship of TGIF. This poses a substantial threat to TGIF's reputation, goodwill, and the value of its marks.

Even if there is not a "presumption" of irreparable harm, case law and the reality of franchise arrangements demonstrate that when a former franchisee continues to pass itself off as a licensed franchise, there is usually a substantial threat of irreparable harm to the franchisor. And this case is no exception. There is a substantial threat that TGIF will suffer irreparable injury if the injunction is not granted.

V

The court next finds and concludes that the threatened harm to TGIF outweighs the threatened harm to defendants. If an injunction is not issued, TGIF loses control over its marks, and it faces a substantial threat to its reputation and the goodwill it has built in its brand. Its name and trademarks also stand to lose significant value if it cannot enjoin terminated franchisees from continuing to use them, and if unsanctioned restaurants throughout the Pacific Northwest and Northern California continue to operate as TGI Friday's locations. As discussed above, TGIF faces a substantial threat of irreparable injury.

Although defendants will incur harm by being preliminarily enjoined, the harm is not irreparable. Defendants will be enjoined from further use of TGIF's marks and from passing their restaurants off as TGI Friday's locations. Defendants contend they will be forced to close their restaurants and required to strip their restaurants of TGIF's marks. Even if this is true, and even if TGIF fails to prevail at trial, the harm suffered by the closing of the restaurants is calculable and compensable through money damages.[8] *See Petro Franchise Sys.*, 607 F.Supp.2d at 796-97 (explaining that value of franchise can be calculated in several ways, and holding that, because terminated franchisees' threatened

---

[8]Although TGIF disputes the amount, defendants themselves have estimated that it would cost approximately $500,000 per restaurant to reopen if they were forced to close.

harm is compensable, the threatened harm to franchisor is greater). Also, if TGIF's marks are so integral to defendants' restaurant operations that they will be forced to close their restaurants if they cannot use the marks, this further demonstrates the value of TGIF's name and marks and the substantial threat *it* faces if ten unlicensed restaurants are permitted to pass themselves off as TGI Friday's restaurants.

Moreover, "courts usually hold that when defendants improperly use a plaintiff's trademark, the threatened harm to the plaintiff outweighs the threatened harm to the defendants." *Ramada Franchise Sys.*, 2001 WL 540213, at *3; *see also Burger King*, 766 F. Supp. at 1157 ("Simply put, a terminated franchisee has no right to continue to hold itself out as an authorized franchisee and enjoy its benefits."). Especially where TGIF has established that it has a substantial likelihood of prevailing on its trademark infringement claim, the court is not persuaded that it should deny TGIF injunctive relief based on the threat of harm caused by defendants' inability to use TGIF's marks. The significant threat of irreparable injury to TGIF outweighs the threatened harm to defendants.

VI

Finally, the court finds and concludes that the entry of a preliminary injunction will not disserve the public interest. Although defendants briefly contend that the public interest will

- 19 -

be disserved if they are forced to cease using TGIF's marks and close their restaurants because their employees will lose their jobs and the local neighborhoods and economies will be hurt, there are broader public interests the court must also consider.  The public interest "promotes the protection of valuable trademarks and service marks in a capital-based economy that rewards success through competition." *Ramada Franchise Sys.*, 2001 WL 540213, at *3; *see also Petro Franchise Sys.*, 607 F.Supp.2d at 797 ("[B]ecause there is a high probability of success on the merits of a trademark claim, the public interest is not disserved by an injunction prohibiting Franchisees from using Plaintiff's marks."); *Quantum Fitness Corp.*, 83 F.Supp.2d at 832 ("The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks."). The public also has an interest in not being deceived into believing that it is dining at a TGI Friday's restaurant that is no longer affiliated with TGIF and that is using TGIF's marks without authorization.  *See, e.g.*, *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 379 (3d Cir. 1992) ("In a trademark case, the public interest is most often a synonym for the right of the public not to be deceived or confused.  Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest." (internal citations and quotation marks omitted)).  Accordingly, the public interest will not be

disserved by an injunction prohibiting defendants from continuing
to use TGIF's marks.

                                VII

        Pursuant to Fed. R. Civ. P. 65(c), the party moving for a
preliminary injunction must give "security in an amount that the
court considers proper to pay the costs and damages sustained by
any party found to have been wrongfully enjoined or restrained."
The amount of the security "is a matter for the discretion of the
trial court." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th
Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d
300, 303 (5th Cir. 1978)).

        Defendants request that the court require TGIF to post a bond
for no less than $10 million.  They assert that they have a letter
of intent from a prospective purchaser to purchase all ten
restaurants for $5 million.  They also estimate that it would cost
$500,000 per restaurant ($5 million aggregate) to reopen the
restaurants if they are forced to close.  Although TGIF is willing
to post a bond in the amount the court deems proper, it contends
that defendants' $10 million request is outrageous and based on
mere speculation.

        The court agrees that a $10 million bond is unwarranted and
excessive.  Several considerations inform the court's decision.
Perhaps most important, because TGIF has established a strong
likelihood of success on the merits, the court finds that a

relatively low bond is sufficient, and it gives less weight to speculative harms the injunction may indirectly cause defendants to suffer.  *See, e.g.*, *Petro Franchise Sys.*, 607 F.Supp.2d at 801 ("[B]ecause Plaintiffs' likelihood of success on the merits is strong, this Court elects to resolve uncertainties as to the proper basis for calculation in their favor.").  Under the circumstances of this case, TGIF should not be required to post security for the alleged bid that a prospective purchaser has made.  Whether or not the injunction is issued, the prospective purchaser would have to reach an agreement with TGIF before it can operate the restaurants as TGI Friday's locations.  Also, the preliminary injunction issued today does not order the restaurants to close.  Defendants may continue to operate the restaurants as long as they cease using TGIF's marks.  The assertion that they will be forced to pay to "reopen" all the restaurants is speculative, especially with a prospective purchaser in the mix.  Additionally, defendants' estimate that it will cost $500,000 to reopen each restaurant is not supported by any evidence.  The fairest measure for the security amount in this case is the cost to defendants of removing TGIF's marks from their restaurants and otherwise complying with the post-termination requirements of the franchise agreements, together with the legal fees and expenses of litigation that defendants will incur.  The court has no basis in the record, however, to calculate or even estimate these costs.

After considering the relevant factors, the court concludes that a bond in the amount of $100,000 is proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. If defendants can show that the bond should be increased, they may move separately for that relief. *See, e.g., Gryphon Master Fund, L.P. v. Path 1 Network Techs., Inc.*, 2007 WL 1723703, at *8 (N.D. Tex. June 14, 2007) (Fitzwater, J.) (holding that defendant could move separately to have bond increased); *Olan Mills, Inc. v. Eckerd Drug of Tex., Inc.*, 1988 WL 161314, at *3 (N.D. Tex. Dec. 14, 1988) (Fitzwater, J.) ("Either party may move the court in writing to increase or decrease the bond for good cause shown.").

*     *     *

Because TGIF has satisfied all four requirements for the issuance of a preliminary injunction, the court grants its application. The court has filed a preliminary injunction by separate order today.

**SO ORDERED.**

August 20, 2009.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

- 23 -